UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| TRI-UNION DEVELOPMENT | § | CASE NO. 03-44908-H4-11 |
| CORPORATION, | § | |
| | § | |
| TRI-UNION OPERATING COMPANY, | § | CASE NO. 03-44913-H4-11 |
| | § | |
| Debtors. | § | (JOINTLY ADMINISTERED UNDER |
| | § | CASE NO. 03-44908-H4-11) |

**OBJECTION TO MOTIONS FOR USE OF CASH COLLATERAL;
AUTHORITY TO CONTINUE USING CONSOLIDATED CASH
MANAGEMENT SYSTEM AND FOR AUTHORITY TO MAINTAIN AND
USE EXISTING BANK ACCOUNTS AND BUSINESS FORMS**

COMES NOW, Greenwich Insurance Company ("Greenwich"), a secured creditor and party in interest, who files this Objection to the Motions for Use of Cash Collateral, Motion for Authority to Continue Using Consolidated Cash Management System and for Authority to Maintain and Use Existing Bank Accounts and Business Forms and would show the Court as follows:

**I. SUMMARY OF OBJECTION**

Tri-Union Development Corp and Tri-Union Operating Company, (hereinafter, the "Debtor") and its series "A" Senior Secured Noteholders (the "Noteholders") (who hold over half of the equity in the Debtor) have collaborated for months through a pre-petition lockup agreement to file as a pre pack "blitzkrieg" Plan for the sole benefit of Debtor's Management, the Noteholders, BOA, and their professionals. The Debtor's Disclosure Statement describes a Plan in which the Debtor seeks to abandon its interests, more pointedly its environmental obligations including plugging, abandonment, dismantlement and removal costs ("P&A"), in its

HOUSTON:38318/00001:870635v1

offshore producing properties leased from or operated with the United States Department of the Interior, Minerals Management Service ("MMS") by transferring these liabilities into an underfunded creditor trust for the benefit of the MMS, Greenwich, offshore working interest owners, and the unsecured trade creditors while Debtor's more valuable onshore properties and other assets are retained for the benefit of the Noteholders. The Noteholders professionals, the Debtor's professionals and the Debtor's employees loot over $3,000,000.00 in fees during the first six months of this case (per budget) instead of complying with the MMS directives to P&A their offshore properties. See Debtor's proposed cash collateral budget. These budgeted professional fees are in addition to over $1,000,000.00 in fees paid to Debtor's counsel pre filing as disclosed by Debtor's counsel in their application for employment.

The Debtor as Debtor-in-possession must manage and operate its property in accordance with the laws of the state in which the property is situated. 28 U.S.C. § 959(b). The MMS, pursuant to rights and police powers granted under the Outer Continental Shelf Lands Act has made demand on the Debtor to comply with certain of its P&A and environmental obligations commencing immediately and to be completed by July of 2004. 43 USC § 1333. The MMS has estimated the cost of immediate compliance at 5.75 million dollars. Instead of discharging these environmental obligations as promised to the MMS and the Debtor's working interest owners and ancestors, this Debtor has submitted a "cash collateral" budget in wreckless contempt of the MMS compliance order **with no dollars budgeted for P&A of offshore wells or facilities but millions of dollars expended on professional fees, employee bonuses, and capital expenditures which solely benefit the Noteholder's interests.**

The Debtor's fifty (50) page proposed Cash Collateral Order (the "CCO" or the "Order") masterfully compliments the Debtor's "break out" plan by granting the Noteholders and BOA

every conceivable advantage at this early juncture in the case under the guise of "adequate protection", including but not limited to the following:

1. Stipulations and findings establishing the validity, priority and extent of the secured Noteholders security rights in the Debtor's assets including cash collateral;

2. A definition of "cash collateral" which is overly broad and inclusive for the benefit of the Noteholders;

3. Specific findings that the Noteholders hold <u>perfected, first priority security interest in all assets of the Debtor</u>, thereby, stripping competing interest holds such as the MMS or Greenwich of their rights and claims with no due process and without benefit of an adversary proceeding as required in by Bankruptcy Rule 7001 et. seq.;

4. A rapid "bar date" for third party creditors and the UCC of December 16, 2003 for any third party challenges the validity, priority and extent of the Noteholders liens;

5. Grant of broad and sweeping releases for the benefit of the Noteholders;

6. No reasonable budget or carve out to Committee Counsel to evaluate and prosecute such an adversary proceeding to challenge the validity priority and extent of the Noteholders liens. (The budget allocates $200,000.00 per month for Debtor's professional fees plus $300,000.00 per month for the Noteholder's professional fees but only carves out $15,000.00 for OUCC counsel fees);

7. A grant of super priority, administrative status to the Noteholders higher than any other administrative claim (including administrative claims for environmental cleanup including P&A as may be required by order of the MMS);

8. Payment of "underwater" hedge agreement in favor of BOA without an opportunity to review whether such assumption is in the best interest of the estate is in a reasonable business judgment test;

9. Payment of the (undersecured) Noteholders professionals and BOA's professionals by Debtor (budgeted at $375,000.00 per month) without any reasonableness review from the court, the committee or other third party creditors;

10. **Implementation of a budget process controlled by the Noteholders calculated to exclude funding for disfavored administrative expenses including environmental obligations P&A on the offshore properties but endorsing and budgeting over $3,000,000.00 in professional fees and employee bonuses over the next six months;**

11. Removal of the ability of creditors to surcharge the Noteholder's collateral; and

12. A bar to the solicitation of any plan by the Debtor not supported by the Noteholders (as agreed by the Debtors and the Noteholders in their pre-petition lock-up agreement).

Entry of any of the above outlined provisions, at the outset of this case would be highly prejudicial to Greenwich and all unsecured trade creditors of the Debtor. These overreaching protections cannot be "arms length" adequate protection settlement.

Further, Greenwich urges this Honorable Court to reject any proposed Cash Collateral Order or budget which seeks to elevate payment to the Noteholder's professionals above

payment of the Debtor's environmental obligations and liabilities to the MMS. Instead, Greenwich urges this Honorable Court to order the Debtor to pay its environmental obligations to the MMS as a matter of first priority and approve no budget which does not authorize expenditure 5.75 million dollars for plugging and abandonment costs in the Gulf of Mexico.

This Court simply cannot put its imprimatur on the Debtor's scheme to abandon of its environmental obligations, including plugging and abandonment liability in favor of outrageous payments to professionals, without formulating conditions that will adequately protect the rights of the MMS, Greenwich and the public's health and safety. *Midlantic Natl. Bank v. New Jersey Dept. of Environmental Protection*, 106 S.Ct. 755, 474 U.S. 494, 88 Ld 2d 859 (1986).

## II. Background

Greenwich is a party-in-interest and creditor of (the Debtor) by virtue of eleven surety bonds, Bond Nos. 45035250 through 4503560 issued by Greenwich in favor of the MMS in the aggregate amount of $9,850,000 to ensure the Debtor's compliance with its obligations to the MMS. A schedule of these Bonds is attached as Exhibit A. The Greenwich surety bonds do not "insure" the Debtor's obligation to the MMS but are posted to the MMS if the Debtor fails to fulfill its obligations.

A Security Agreement dated June 30, 2001 by and between the Debtor and Greenwich (the "Security Agreement") grants Greenwich, as surety, a first priority, security interest in certain funds on deposit with Quick & Reilly (the "Account"). The current balance of the Account is approximately $4,700,000.00. The Account is a dual signature account in the name of Avalon Risk Associates, Inc. as Managing Underwriter and Greenwich, not the Debtor.

Prior to the filing of the Debtor's bankruptcy petition, the Debtor had multiple defaults under the terms of the Security Agreement including but not limited to failure to provide additional collateral, failure to pay bond premiums, failure to undertake plugging in abandonment as required by the MMS regulations, failure to provide adequate assurance, and breach of various covenants of the Security Agreement and Surety Contract. After the Debtor refused to cure defaults, Greenwich issued notice of termination of the supplemental bonds in August of 2002. The MMS accepted this notice as a termination of the period of liability of the bonds only and as a result Greenwich obtained further rights to the Account as set forth below. Greenwich extended the Area-Wide bond to allow the Debtor to operate on the Outer Continental Shelf for the purpose complete P&A work promised to the MMS but never commenced by the Debtor.

In accordance with Section 5 of the Security Agreement, an after an event of default, Greenwich was entitled to:

> "with out any requirement of notice, setoff any and all amounts owing by the Debtor to it against any monies held by the surety on behalf of the Debtor or any other property of the Debtor which may now or hereinafter be in the surety's possession or control, and such right as setoff shall be deemed to have been exercised immediately upon such stated or accelerated maturity as aforesaid even though such setoff is not noted on the surety's records until later time."

In addition to the Account and a part of the General Indemnity Agreement dated June 30, 2001 (the "General Indemnity"), the Debtors granted a lien in favor of Greenwich on all of its assets, including the offshore producing properties: as described below

> Furthermore, in order to induce the Company and Petro-Marine Underwriters, Inc. to write and issue various bonds on behalf of the Undersigned, including, without limitation, any bonds previously issued, any bonds issued contemporaneously herewith, as well as any and all other bonds subsequently written by or through the Company and/or Petro-Marine for or on behalf of the Undersigned, and in order to secure the payment (i) of any and all bond premiums, (ii) of any other payments which the Undersigned may be obligated to make under any written agreements between the Undersigned and the

Company and/or Petro-Marine, (iii) of any and all penalty or interest charges allowable by contract or by law; and/or (iv) of any actual and reasonable attorney's fees incurred in the collection thereof, and in order to secure the enforcement or protection of any of the Company's or Petro-Marine's rights hereunder, or with respect to any default under any other agreements between the Company and/or Petro-Marine with the Undersigned regarding any bonds, and/or secure against any default by the Undersigned under a Zero Coupon Operator's Agreement, if any, between the Undersigned and Petro-Marine Underwriters, Inc., the Undersigned does hereby grant, convey, hypothecate and assign to the Company and/or Petro-Marine Underwriters, Inc., contractual lien rights upon any and all of the Undersigned's Oil, Gas & Mineral leases (and any and all rights, appurtenances, wells, production facilities, equipment, flow lines and/or pipelines situated thereon) which may benefit in anyway, directly or indirectly, from the issuance of those bonds issued by the Undersigned and/or Petro-Marine in favor of any party for and on behalf of the Undersigned, as bond principal(s). These contractual lien rights may be enforced, protected and perfected in the same manner as any lien under the applicable Oil, Gas and Water Well Line Rights Statutes of either Louisiana and/or Texas, as the case may be; provided, however, that such lien rights shall be created only upon the default in the timely payment of any bond premium(s) or other payments which the Undersigned may be obligated to make under any written agreement between the Undersigned and the Company and/or Petro-Marine Underwriters, Inc. In order to further secure such liens, the Undersigned further hereby grants to the Company all of the rights, privileges and powers provided for in Louisiana Revised Statutes 9:5131, *et seq.*, and the Undersigned hereby designates the Company, or any employee, agent, or other person named by the Company (at the time any seizure, attachment or sequestration of any of the Undersigned's property is effected by the Company) to serve as a keeper of such seized, attached or sequestered property, and all rights appurtenant thereto, together with all fruits or revenues produced therefrom, pending the judicial sale thereof. The Undersigned further specifically waives any and all requirements for the posting of any seizure, attachment, sequestration and/or keeper's bonds. The keeper's fees shall be determined by the Court before which the proceedings are pending, and the payment of such fees shall be secured by the conventional lien rights granted herein.

Greenwich asserts that these liens, security rights and other rights came into existence prior to or concurrent with Noteholders security rights and therefore may prime the note holder's lien with respect to the assets and the proceeds therefrom; yet the proposed CCO strips Greenwich's right and ranks the Noteholders ahead of Greenwich without a benefit of an adversary proceeding in violation of Greenwich's due process rights.

Finally, should the MMS call the Greenwich Bonds, Greenwich would hold priming and preferred positions on the Debtor's cash flow and subrogation of the rights of the MMS all of which prime the rights of the Noteholders pursuant to 31 U.S.C. § 9309 and *Pearlman v. Reliance Insurance*,

371 U.S. 136 (1962) and its progeny. Once again, these rights are subordinated to the Noteholder's under the "adequate protection" concessions.

### III. USE OF CASH COLLATERAL

#### A. Cash Collateral Defined

Cash collateral is defined as:

"cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties..."

11 U.S.C. § 363(a). Fees for self-storage units, cash dividends on stock pledged as collateral and funds received from the collection of accounts have also been held to be cash collateral.' Cash collateral is broadly defined and the interpretation of the term has been consistent with the broad definition.

#### B. Using cash collateral

A Debtor may use cash collateral only if (i) the secured creditor whose collateral is being spent consents or (ii) there is a court order allowing the expenditure of such collateral. 11 U.S.C. § 363(c)(2). Before a court may make an order allowing the use of cash collateral, it must find that the secured creditor is adequately protected. *In re Atrium Devel. Co.*, 159 B.R. 464, 471 (Banks. E.D. Va. 1993); *In re Heatron, Inc.*, 6 B.R. 493 (Banks. W.D. Mo. 1980).

Adequate protection is not defined by the Bankruptcy Code. The concept of adequate protection has its roots in both the Fifth Amendment to the Constitution and policy grounds. *In re Sheehan*, 39 B.R. 859, 864 (Banks. D. S.D. 1984). Three forms of adequate protection described in the Bankruptcy Code are: (i) requiring the Debtor to make cash payments to the extent that the value of its interest in property is decreased; (ii) providing the creditor a replacement or additional lien to

the extent that the value of its interest in property is decreased; and (iii) granting other relief which would ensure that the creditor realizes the "indubitable equivalent" of its interest in the property. 11 U.S.C. § 361. The three methods listed in the Code are not exclusive. Whatever method is utilized, "the purpose of adequate protection is always to preserve the cash collateral creditor's interest in the property involved." *First Bank of Miller, S.D. v. Wieseler*, 45 B.R. 871, 875 (D.S.D. 1985) (emphasis added); *see also MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396 (10th Cir. 1987) (The purpose of providing adequate protection is to insure that the secured creditor receives the value for which it bargained originally.)

Adequate protection is typically established by showing that the collateral is being used to maintain and enhance the value of the income producing property securing the interest. *Atrium*, 159 B.R. at 471; *Nationsbank v. LDN Corp. (In re LDN)*, 191 B.R. 320, 327 (Banks.E.D. Va. 1996). However, adequate protection can be shown in other ways, as set out above. Some factors which are used in determining whether a creditor is adequately protected are whether or not there is equity in the property, whether the property is declining in value, and whether any post-petition payments due the creditor are current. *Atrium*, 159 B.R. at 471. Whatever the facts of a case may be, the court must make specific requirements upon the Debtor to insure that the creditors will have adequate protection. *Heatro*n, 6 B.R. at 496.

**C. The Burden of Proof**

The initial burden at a cash collateral hearing is on the creditor. The objecting creditor must show the validity, priority and extent of its interest in the cash collateral by a preponderance of the evidence. 11 U.S.C. § 363(o)(2); *In re Placid Oil Co.*, 80 B.R. 824 (Banks.N.D. Tex. 1987).[2] The creditor must first prove that it has a perfected security interest; it must then prove the value of the property to which the liens attach. *Chequers Investment Assoc. v. Hotel Sierra Vista Ltd. Partnership*

*(In re Hotel Sierra Vista Ltd. Partnership)*, 112 F.3d 429, 434 (9th Cir. 1997).[3] Thus, the creditor's first burden is to prove by a preponderance of the evidence that it has a secured claim.

It is incumbent upon a court to make a determination as to the value of the interest and the property securing it before allowing before allowing a Debtor to spend cash collateral. *Wieseler*, 45 B.R. at 875. However, the Bankruptcy Code does not specify a method for valuing collateral. Value should be determined on a case-by-case basis, giving consideration to the purpose of the valuation and the proposed use of the property. *Matter of T-H New Orleans Ltd. Partnership*, 116 F.3d 790, 799 (5th Cir. 1997); *O'Connor*, 808 F.2d at 1397; *In re O.P. Held, Inc.*, 74 B.R. 777, 782 (Bankr.N.D. N.Y. 1987); *Resolution Trust Co. v. Mursay (In re Midway Partners, Inc.)*, 995 F.2d 490, 494 (4th Cir. 1993), *cert. denied* 114 S. Ct. 599 (1993) (value should be determined in light of the proposed disposition and use of the property). The creditor's second burden is therefore simply to present evidence sufficient for the court to determine the value of the property to which its lien attaches. *Chequers*, 112 F.3d at 434.

Once the creditor proves its interest in the cash collateral at issue, the burden shifts to the Debtor to show that the creditor is adequately protected. *Matter of C.G. Chartier Construction, Inc.,* 126 B.R. 956, 960 (E.D.La. 1991); *In re 680 Fifth Ave. Assoc, Inc.,* 154 B.R. 38, 43 (Bankr. S.D. N.Y. 1993) (once creditor proves interest, burden is on Debtor to show that secured creditor will receive the value for which he bargained). The evidentiary burden the Debtor must meet is unclear; some courts require proof by a preponderance of the evidence, while others require proof by clear and convincing evidence. *In re Glasstream Boats*, 110 B.R. 611, 613 (Bankr.M.D. Ga. 1990). What is clear is that the court must insure that the "vested property rights of the secured creditor and the values and risks bargained for by that creditor prior to bankruptcy are not detrimentally affected." *O'Connor*, 808 F.2d at 1398.

In *McCombs Properties VI, Ltd. VILtd. v. First Texas Savins Ass'n. (In Re McCombs)*, 88 B.R. 261, 267 (Banks.C.D. Cal. 1988), the court employed a preponderance of the evidence standard for determining whether a creditor was adequately protected. The court in *McCombs* recognized the authorities requiring a Debtor to provide clear and convincing proof of adequate protection, but dismissed those authorities, stating that "[a]dequate protection is not meant to be a guarantee that the secured creditor will receive the value of its interest in the collateral." *McCombs*, 88 B.R. at 267. However, most authorities agree that guaranteeing the secured creditor's claim's value is, in fact, the purpose of adequate protection. *See, e.g., O'Connor*, 808 F.2d at 1398 (stating that "[t]he first effort of the court must be to insure the value of the collateral will be preserved.")

16.     Other courts have required a showing of adequate protection by clear and convincing evidence. *O.P. Held*, 74 B.R. at 784; *In re Leavell*, 56 B.R. 11, 13 (Banks. S.D. Ill. 1985); *In re Sheehan*, 38 B.R. 859, 868 (Banks. D. S.D. 1984). In *Sheehan*, the court discussed at length the constitutional and policy considerations behind the policy of adequate protection. Based on its analysis of the legislative history of Bankruptcy Code § 361 and the case law interpreting it, the court in <u>Sheehan</u> proposed the following as a "workable legal test" for determining whether a secured creditor is adequately protected: "[a] party proposing to use cash collateral must prove by clear and convincing evidence that an entity claiming an interest in cash collateral <u>will realize the value of its bargain in light of all the facts and circumstances of the case.</u>" *Sheehan,* 38 B.R. at 868. (emphasis supplied). The *Sheehan* standard is consistent with legislative history, allowing flexibility and a case-by-case balancing approach while placing a high burden of proof on the party requesting the use of cash collateral. *Id*.

### IV. Objection

The Debtors have filed a Motion to Use Cash Collateral without any showing whatsoever on the part of the Noteholders or valuation of their rights and collateral; instead the Debtors have conceded a 50 page "Final Interim Order" which extends well beyond the usual "adequate

protection payment" and is overreaching to the point of being egregious. This proposed Order is a stepping stone to pursuing confirmation of a Plan to abandon the Debtor's environmental obligations to the MMS and the ancestors in title while retaining and drilling profitable wells for the Noteholders, paying professionals over $3,000,000.00, and paying large bonuses to the Debtor's employees..

A.  **The Proposal CCO Grants Susbstantive, Final Relief As "Adequate Protection" And Denies The Fundamental Due Process Rights to All Non-Bondholder Creditors**

This case was commenced on October 20, 2003. The Committee was appointed on October 28, 2003. Yet on November 5, 2003, with insufficient notice and opportunity to review underlying documents, the Debtor asks the Court to approve an agreed order which substantially prejudices the rights of the estate and the rights of all creditors, including the MMS, for the sole benefit of the Noteholders, BOA and their professionals. For example as "adequate protection":

- the Debtor concedes the validity, priority and extent of the secured bondholders liens;
- the Debtor defines "cash collateral" in an overbroad fashion to bootstrap the rights and claims of the Noteholder;
- the CCO finds that the Noteholders have perfected first priority security interests in all assets of the Debtor without an adversary proceeding and adverse to rights and claims of other secured creditors when they do not;
- the Debtor grants a super priority, administrative status above all other administrative claims without any showing;
- the Debtor grants a broad and sweeping release to the Noteholders;

- the CCO sets a rapid bar date for third party creditors of, December 16, 2030, to file an adversary proceeding to challenge the validity, extent and priority of Noteholders liens;

- the CCO is tantamount to assumption of a hedge agreement with Bank of America without an opportunity to review whether it is in the best interest to the estate to assume the hedge;

- the CCO orders payment by the estate of the Noteholder's and BOA's professionals ($642,000.00 per month estimate per budget) without any check from the court;

- the CCO removes the ability to surcharge the collateral;

- the CCO would bar the solicitation of any plan by the Debtor of any plan not supported by the Noteholders;

B.   **Environmental Obligations**

With the proposed Plan, the Debtor seeks to retain desirable mineral leases while casting off unprofitable properties such as those ripe for plugging and abandonment. Such a self serving tactic is prohibited under the jurisprudence including *Midlantic* and *Texas v. Lowe (In re HLS Energy Co., Inc.)*, 151 F.3d 434 (5th Cir. 1998). The *Midlantic* case arose out of the bankruptcy of Quanta Resources Corp ("Quanta"). Quanta processed waste at oil facilities located in New York and New Jersey. The Chapter 7 trustee of Quanta sought to abandon those oil waste facilities pursuant to § 544(a) of the Bankruptcy Code. The Bankruptcy Court approved abandonment of those waste cites over the objection of the New Jersey Department of

Environmental Quality who maintained "that the estate had sufficient funds to protect the public from the dangers posed by hazardous waste." *Midlantic*, 106 S.Ct at 499.

After thorough analysis of the legislative history behind § 544, Justice Powell, writing for the Supreme Court, concluded, "the bankruptcy court does not have the power to authorize an abandonment without formulating conditions that will adequately protect the public's health and safety." *Id.* at 494-495.

In this case, the Debtor and the secured Noteholders have artfully schemed to avoid the adverse consequences of outright abandonment by "transferring" offshore producing properties to a unfunded, under capitalized trust. The net result is the same regardless of the Debtor's clever labels. Accordingly, this Cash Collateral Order and budget should not be approved in this court without budgeting for each and every environment obligation, including P&A demanded by the MMS.

The MMS has identified to the Debtor over $5.75 million in current abandonment obligations to be completed by July 2004. The budget proposed by the Debtor does not even contain a line item for satisfaction of these current P&A obligations let alone accrual for future obligations.

C. <u>**The Budget**</u>

The Order provides that additional adequate protection to the Noteholders by paying all funds exceeding $5.5 million to the secured creditors. However, not all reasonable and necessary operating expenses are in the budget and accounted for in the expenses which total the $5.5 million. This adequate protection payment acts to elevate the Noteholder's claims above Greenwich and the MMS because P&A accrual and payment obligations are not line items in the

budget. Further, it is not possible to determine if this is the proper measure of appropriate adequate protection because the amount to be paid is uncertain.

While post-petition, environmental obligations ordered by the MMS are not contemplated by the budget, and offensive amount of professional fees are budgeted. Retainers in the aggregate amount of $430,661.72 was already been paid to Debtor's professionals on the petition date. An additional $200,000 per month of post-petition fees for counsel for the Debtor and a shocking $375,000.00 per month for professional fees of the Noteholders and BOA are ratified in the proposal budgets. These "estimates" do not include months fees spent devising this Plan. Significant professional fees were paid pre-petition to the prejudice of currently due P&A obligations and other operating obligations. Further, the Order provides that the Debtor shall pay the fees of the Pre-Petition Secured Parties, Bank of America's counsel and the Collateral Agent's counsel without review for reasonableness all the while allowing the Debtor to shirk its environmental and P&A obligations to the MMS.

D.     **Super Priority Administrative Expense**

The CCO provides a super priority administrative claim to the Noteholders over all other obligations to the extent of diminution in the value of the property. However, oil and gas properties are of the kind that by their very nature diminishes in value. There has been no proof of the decrease in value of the properties. The import of this provision is not clear and is unworkable as described. The Debtor has not demonstrated the appropriateness under the Code of granting this relief.

Further, the granting of a super priority expense claim to the Noteholders works to cut off the claims of legitimate administrative expenses necessary for the Debtor to comply with its

obligations to third parties and its obligations under the law to the extent that provision is not made for such expenses in the budget.

E. **The Order Cuts off Competing Secured Rights**

The CCO provides on page 13 that the Noteholders will be granted a lien that absolutely subordinates all other interests. Included in the interests subordinated to the claims of the Noteholders are Greenwich's security rights to the Account, Greenwich's lien rights, Greenwich's other statutory rights, the MMS rights, rights to recoupment and netting. Further, this lien is granted to the Noteholders without any evidentiary showing under the law.

F. **Validity and Priority of Liens**

The CCO finds as a matter of law that the Noteholders hold first priority security interests in substantially all of the Debtor's property. These findings are simply conceded by the Debtor without an opportunity for meaningful creditor review and without the benefit of an adversary proceeding as required by Bankruptcy Rule 7001. The CCO subordinates all other competing claims.

With regards to the Account, Greenwich objects to any implication that the Debtor has any current rights in the Account or that any party has an interest superior to it. The Security Agreement clearly indicates that Greenwich has a first priority security interest in its collateral. Further, the funds are held in a Greenwich/Avalon account, not an account of the Debtor. To the extent the Debtor claims any interest in the Account, Greenwich, not the Noteholders, has the first priority security interest in those funds. Greenwich further objects to the granting of any

lien on the Account to the extent such a lien did not exist pre-petition. Greenwich's rights as well as the rights of other secured creditors would be eviscerated by entry of this CCO.

G.  **The Order Cuts off Legitimate Administrative Claims and Secured Rights and Claims**

Paragraph Q. of the Order proscribes the granting by the Court of "any priority administrative claim status with respect to any claim that is *pari passu* or superior to the priority status granted to the Pre-Petition Claims and Pre-Petition Secured Parties' other claims under this Order."
The Cash Collateral Order attempts to prevent, with the exception of the carve out for professional fees and US Trustees fees, the payment of any valid administrative claims of the estate except those in the budget. Of course, the budget does not allow any administrative expenditures not expressly approved by the Noteholders.

H.  **Not All Operative Documents Have Been Provided**

Certain Events of Default under the CCO are as defined by the Hedge Agreement and other Pre-Petition Agreements many parties in interest have not had the opportunity to review.

I.  **The Debtor Is Already in Default Under the Terms of the Order**

Greenwich also objects because pursuant to the Order, the Debtor would be in default upon its entry. The Order provides the following as an Event of Default in Paragraph G.: "Allowing to *exist* any security interest . . . on any of its assets or properties that is *pari passi* or senior to the Pre-Petition claims or Pre-Petition Liens." Greenwich's lien is superior to the

interest of any Noteholder claim. Therefore, upon entry of the Order, the Debtor will be in default under its terms. The requested relief of the Order does not comport with the realities of the facts of this case.

**J.      The Order Attempts to Convert the Account into A DIP Account**

The Order provides that all Cash Collateral will be placed in DIP Accounts. Cash Collateral is defined as, among other items, deposit accounts. The devil is in the detail. The funds on deposit, in which the Debtor has at best a residual interest, serve as Greenwich's collateral for the Bond. It is not appropriate absent the satisfaction of all obligations under the Bonds for the funds to become available for use by the Debtor or its other creditors.

The Account belongs to Avalon and Greenwich. The Debtor has no direct interest in the funds. At best, the Debtor has, an tenuous equitable interest in the Account. The Account is not appropriate for conversion to a DIP account and should not be an account to which the Debtor has access. Until the Debtor has satisfied its plugging and abandonment obligations in full, it has no right to hold the funds in the Account. The Noteholders can't have their cake and eat it too. Either the Debtor has no interest in the Account or the Debtor must acknowledge Greenwich's senior interest in the Account.

Greenwich objects to the Account being governed by either the Cash Management or Bank Account Motions and Orders. Greenwich objects to having the Account designated in any way as Pre-petition Collateral and Cash Collateral as defined in the Cash Collateral Order in paragraphs (i) and paragraph 4 respectively.

WHEREFORE, PREMISES CONSIDERED, the Greenwich respectfully requests that this Court deny the relief sought in the Cash Collateral Motion and grant such other and further relief to which Greenwich may show itself to be entitled.

Dated: November 17, 2003.

        Respectfully submitted,

        LOCKE LIDDELL & SAPP LLP

        /s/   Elizabeth C. Freeman
        Omer F. Kuebel, III
        La. Bar No. 21682
        Federal I.D. No. 32595
        601 Poydras Street, Suite 2400
        New Orleans, LA 70130-6036

        Philip G. Eisenberg
        State Bar No. 24033923
        Elizabeth C. Freeman
        State Bar No. 24009222
        Federal I.D. No. 24564
        600 Travis Street, Suite 3400
        Houston, Texas 77002
        Phone: (713) 226-1200
        Fax: (713) 223-3717

## **CERTIFICATE OF SERVICE**

In compliance with BLR 9013(a), the undersigned hereby certifies that on November 17, 2003, that a true and correct copy of the OBJECTION was served on parties by facsimile or e-mail as shown with an asterisk ("*"), and upon all other parties who do not receive service via electronic mail, via first class mail, postage prepaid.

        /s/ Elizabeth C. Freeman